**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

UNITED STATES OF AMERICA

v.                                                   CASE NO.: 3:08cr47/MCR

CRAIG LOWELL HARRIS

_____/

**O R D E R**

Before the court are defendant Craig Harris' Motion to Withdraw Guilty Plea (doc. 104) and the government's Motion to Dismiss Count V of the Indictment (doc. 113). For the reasons explained below, the court denies defendant's motion and grants the government's.

**Background**

On May 20, 2005, the grand jury returned an indictment against Andrew Wilson, Mark Nelson, and Craig Harris charging them with conspiracy to distribute fifty grams or more of crack cocaine and/or five kilograms or more of powder cocaine in the Northern District of Florida between the dates of May 1, 2000 through May 20, 2008. The indictment also charged the defendants individually and jointly in separate, substantive counts with possession with intent to distribute crack and powder cocaine. Harris was charged in the conspiracy count (Count I) and in one of the substantive counts for distribution of crack cocaine (Count V). On July 2, 2008, Harris entered a guilty plea on the charges in both counts against him and his sentencing hearing was scheduled for October 2, 2008.[1] On July 15, 2008, Harris submitted a personal letter to the court, explaining that he felt he had been "railroaded in this case" and asking the court "for forgiveness and to be lieniant [sic]

_____

[1] Andrew Wilson entered a plea of guilty on July 1, 2008, and was sentenced to life in prison. Mark Nelson pled guilty on July 4, 2008, and was sentenced to 20 years in prison on September 12, 2008.

on me."  The letter, which did not contain a request to withdraw the guilty plea, was returned to Harris without filing based on the court's local rules, which do not permit the direct, personal filing of any paper by a party represented by counsel.  Local Rule 11.1(D).  Harris has been represented by court-appointed counsel at all times.  On October 2, 2008, Harris appeared before the court with counsel for sentencing; however, at the start of the hearing, counsel advised the court of a breakdown in communication between he and Harris and of Harris' desire for new counsel.  The court permitted counsel to withdraw and directed the Federal Public Defender's Office to assign the case to another attorney on the Criminal Justice Act panel.  Harris sentencing was rescheduled for December 12, 2008.  Harris new attorney appeared on October 21, 2008, and subsequently filed a motion to continue the sentencing hearing, which the court granted.[2] Defendant then appeared before the court with counsel for sentencing on March 12, 2009.  At the start of the sentencing hearing, counsel advised the court she had been presented with a handwritten motion to withdraw guilty plea by Harris, which she provided to the court.  The court continued the sentencing and allowed counsel time to properly file a motion to withdraw guilty plea, which she did on March 27, 2009. Following receipt of the government's response in opposition to the motion, the court conducted a lengthy evidentiary hearing on the motion on April 28, 2009, and May 4, 2009.[3]

The evidence at the hearing showed the following.  On April 1, 2008, Harris and his fiancé, Darlene Freeman appeared at the De Funiak Springs, Florida police station and reported they had information about the drug dealing activities of Andrew Wilson.[4]  De Funiak Springs police contacted Okaloosa County Deputy Sheriff, Katherine (Kat) Bowling

---

[2]  Sentencing was rescheduled for January 30, 2009, and then later March 12, 2009, based on motions to continue by defense counsel.

[3]  The hearing started on the 28th but could not be completed that day; as a result, the hearing was suspended and completed on May 4th, the first date counsel and the court had available to complete it.

[4]  Andrew Wilson was a well-known and major drug trafficker in the area.  He had been under investigation for drug trafficking by the Okaloosa County Sheriff's Office and the Florida Department of Law Enforcement for some time prior to April 1.  Wilson had not yet been arrested or charged in connection with the investigation, however.

who traveled to the station, along with Deputy Isaac Cosby, to interview Harris and Freeman.  During the interview, Harris told Bowling and Cosby he had been working for Wilson for the past year, transporting and selling drugs for him, and until recently had been living in a trailer with Freeman on Wilson's property.  Harris told Bowling he had transported or sold 20 to 30 kilograms of cocaine (some of which was crack cocaine) for Wilson.  Harris also stated he was a heavy crack user and that Wilson had given him drugs in exchange for his help with Wilson's drug operation.  Harris had just been beaten up by Wilson and kicked off Wilson's property. [5]

Harris and Freeman both signed up as confidential sources and agreed to assist law enforcement in its investigation of Wilson.  The were given $200.00 to satisfy a debt to Wilson and $100.00 for food and a hotel.  They were also given a cell phone with prepaid minutes which they were to use to contact law enforcement with information about Wilson.  The plan was for Harris to regain Wilson's trust and eventually move back onto Wilson's property, which happened within a short time.  For several weeks thereafter, Harris and Freeman kept Deputy Bowling apprised of Wilson's whereabouts and activities and in particular the drug deals taking place on the property.  Most of the intelligence information was relayed to law enforcement by Freeman, as apparently she was the one with the cell phone.  Deputy Bowling, however, understood that the information provided came primarily from Harris through Freeman.

In addition to the information provided on Wilson's drug dealing activities, Harris made one controlled buy of crack cocaine from Wilson on April 21.[6]  He also assisted in the recovery of over 50 grams of crack from co-defendant, Mark Nelson, on April 21, 2008, by notifying Deputy Bowling, through Freeman, of a pending deal.[7]  Following the arrest of

---

[5]  In addition, at some point earlier, Freeman's collar bone had been broken by Wilson's wife.

[6]  The government and law enforcement characterize this transaction as recorded but "uncontrolled" because of complications with the deal involving other drugs and persons and a brief period of time when Harris was unaccounted for, although  through no fault of his own.  As a result, although Harris did purchase crack from Wilson on this occasion at the direction and under the control of law enforcement, no arrests were made.

[7]  The phone call to Deputy Bowling was made by Freeman.

Mark Nelson, Harris gave another statement in which he told law enforcement he had transported approximately 40k of crack cocaine for Wilson.[8]  A few days later, Harris was involved in another drug transaction with Wilson; however, law enforcement maintains this deal was made without the approval or knowledge of law enforcement; it is law enforcement's position that Harris' involvement in this deal was a violation of his confidential source agreement.  The deal occurred on April 25, 2008, at which time Harris and Wilson left Wilson's property together and traveled to Ponce De Leon, Florida.  Harris and Freeman both testified that Freeman contacted Deputy Bowling and advised her that Harris and Wilson had left together but that Freeman did not know where they were going because Harris had been unable to give her any additional information due to Wilson being present.  According to Freeman, Deputy Bowling asked that she call her when they returned, which Freeman says she did but Deputy Bowling did not answer so Freeman left a message asking Deputy Bowling to return her call.  Freeman stated that later that evening she and Deputy Bowling spoke and Freeman relayed to her that Harris and Wilson had gone to Ponce De Leon to deliver crack to "DD."[9]  Freeman testified that Deputy Bowling thanked her and paid her $50 for the information.  Deputy Bowling, however, testified neither Freeman nor Harris ever told her about the drug deal and, although Freeman did call her on the 25th, all she said was that Harris and Wilson had left the property together to go to Ponce De Leon to mail a letter.  Deputy Bowling did acknowledge paying Freeman $50 for intelligence information given on the 25th but says that was only for the information about Wilson and Harris traveling to Ponce De Leon to mail a letter.[10] On April 25th, Wilson and Harris did deliver $200 worth of crack cocaine to Devlon Brown in Ponce De Leon.[11]

_____

[8]  This is a 10-20k increase from his earlier statement on April 1.

[9]  "DD" is a street-name for Devlon Brown.

[10]  A summary of payments to Darlene Freeman prepared by Deputy Bowling identifies the payment as "intel (FDLE buy)."  (Government's Exh. I-1).

[11]  Devlon Brown was working as a confidential source for law enforcement as part of this deal. This was a controlled buy.

The deal on the 25th is a source of significant dispute between the parties. Harris maintains he (through Freeman) contacted Deputy Bowling before the deal to advise her of what was going on with he and Wilson and that Freeman told Bowling all she knew at that time, as Harris could not give her any additional information without jeopardizing their safety. Further, Harris argues, Freeman attempted to tell Bowling about the deal as soon as Harris returned but Bowling did not answer her phone. As soon as she called Freeman back, Freeman told her what had taken place. Harris insists it was impossible to avoid this deal without arousing Wilson's suspicions and subjecting he and Freeman to harm. The government maintains Harris could have and should have gotten out of making the deal with Wilson and at a minimum should have contacted Deputy Bowling as soon as the deal was over to disclose what transpired. The government further maintains this was in fact a violation of Harris' confidential source agreement.[12]

Harris was arrested on May 21, 2008, and charged along with Wilson and Nelson with conspiracy to possess with the intent to distribute 50 grams or more of crack cocaine and 5 kilograms or more of cocaine powder (Count I) and individually with possession with the intent to distribute crack cocaine (Count V). This second charge is based on the April 25th sale of crack to Devlon Brown. According to Harris, following his arrest and during his transport to the county jail he was told by law enforcement if he cooperated with the government he would receive probation at sentencing. He says he was later told he needed to enter a guilty plea to avoid a life sentence.

---

[12] Notwithstanding the government's position that Harris violated his confidential source agreement with law enforcement by his involvement in the drug deal with Devlon Brown on the 25th, law enforcement did not terminate its relationship with Harris or Freeman and, although Deputy Bowling had no further contact with Harris under the agreement following the 25th, she continued to rely on Freeman as a source of information on Wilson's whereabouts and made eleven payments to Freeman between April 30th and May 24th, six of which were for intelligence.

**Discussion**

Harris maintains he should be allowed to withdraw his guilty plea because he was improperly used as a confidential informant by law enforcement, his attorney failed to investigate the facts and his possible defenses, and his guilty plea was coerced by both law enforcement and his attorney.  The government objects to defendant being permitted to withdraw his plea and states that no promises or threats were made to defendant by law enforcement regarding immunity from prosecution or the length of his sentence and no exculpatory information was withheld by the government.  The government relies on the transcript of the defendant's rearraignment and plea hearing in support of its position that defendant's guilty plea on both counts was entered knowingly, intelligently, and voluntarily. Notwithstanding, the government has filed a motion to dismiss (with prejudice) the charge of possession with the intent to distribute crack cocaine in Count V, which, the government argues, if granted, should eliminate any concerns over the circumstances of defendant's prosecution for conduct committed while arguably acting as a confidential informant for law enforcement.[13]   Harris responds and suggests his guilty plea on Count V cannot be separated from his guilty plea to the conspiracy charged in Count I and that both guilty pleas have been infected by law enforcement's threats and coercion and his attorney's incompetence and threats.

Before accepting a guilty plea from a defendant the district court must be assured that the defendant has not been pressured or coerced into entering a guilty plea and that he understands the nature of the charges and appreciates the consequences of his guilty plea.  *United States v. Freixas*, 332 F.3d 1314, 1318 (11th Cir. 2003).  Once these core concerns are satisfied and the plea is accepted, a defendant may be permitted to withdraw his guilty plea prior to sentencing only on proper showing of a fair and just reason for the withdrawal.  *Id.*; Fed.R. Crim.P. 32(e).  Although this standard is to be liberally construed, a defendant does not have the absolute right to withdraw his guilty plea at any time prior to sentencing.  *United States v. Weaver*, 275 F.3d 1320, 1328 n. 8 (11th Cir. 2008); *United*

---

[13] *See* footnote 15.

Case No.: 3:08cr47/MCR

*States v. Buckles*, 843 F.2d 469, 471 (11th Cir. 1988). In considering whether a defendant has shown a fair and just reason for the withdrawal of a guilty plea, the court should consider (1) whether defendant had close assistance of counsel at the plea, (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved or wasted by allowing the withdrawal; and (4) whether the government would be prejudiced by the withdrawal. *Freixas*, 332 F.2d at 1318; *United States v. Najjar,* 283 F.2d 1306, 1309 (11th Cir. 2002); *Weaver*, 275 F.3d at 1328; *Buckles*, 843 F.2d at 472. These factors should be considered as part of the totality of the circumstances surrounding the plea. *Freixas*, 332 F.2d at 1318; *Buckles*, 843 F.2d at 471-72.

As a threshold matter, the court has considered the government's motion to dismiss the charge in Count V. Harris argues that the court cannot logically or conceptually distinguish one plea from the other in terms of evaluating whether the guilty pleas were entered knowingly and voluntarily and that the misrepresentations by law enforcement about the possible length of the sentence and the threats by law enforcement and counsel about the sentence Harris would receive if he did not plead guilty were made as a whole and not to any one count individually. Notwithstanding, the question of whether the court is able to distinguish the knowing and voluntary nature of one plea from another has no bearing on the government's ability to dismiss a charge under Rule 48 of the Federal Rules of Criminal Procedure. Nothing in Rule 48 prohibits the dismissal of Count V, and given that the motion is for dismissal with prejudice the court finds no reason not to grant the motion.[14]

The dismissal of Count V with prejudice eliminates the need for the court to consider whether Harris has shown a fair and just reason for withdrawal of his guilty plea on the

---

[14] Harris also argues that the court should not allow the government to dismiss Count V because the government's motive for seeking the dismissal is to make it easier for the court to deny Harris' motion to withdraw his plea on the conspiracy charge. The court finds nothing improper about the government's motive, again noting that the dismissal is with prejudice.

charge of possession with intent to distribute.[15] The court, however, disagrees with Harris' argument that a dismissal of Count V somehow precludes consideration of whether Harris' plea to Count I was knowing and voluntary. The court finds no difficulty in separating defendant's plea to the charge in Count V from his plea to Count I. The factual circumstances surrounding the two charges are easily separated, as are any potential defenses. Harris' statements to law enforcement on April 1 and April 21 about his prior involvement with Wilson in transporting and distributing drugs over a ten month period are the basis for the conspiracy charge in Count I while his involvement in the single drug transaction on April 25 in which he and Wilson delivered crack to Devlon Brown forms the

---

[15] The court noted some concern at the hearing with the lack of supervision and structure by law enforcement over Harris once he signed on as a confidential informant. For example, Harris presented to law enforcement on April 1 as a serious crack cocaine addict, recently beaten up by Wilson, and eager to provide information on Wilson's drug activities in exchange for money. Harris was given money to repay a debt to Wilson in hopes he would be able to regain Wilson's trust and reenter Wilson's drug operation as his "right hand man." Harris was told not to do drugs and not to engage in unsupervised drug deals. After Harris was successful in regaining Wilson's trust he and Freeman returned to live on Wilson's property. They were paid money by law enforcement in exchange for information on Wilson and the drug deals taking place on his property. They were also given money for food. On two to three occasions Freeman contacted Deputy Bowling and advised her that Harris had taken the money law enforcement had given them for food; as a result, Deputy Bowling took Freeman out to eat. Although Deputy Bowling denied Freeman told her that Harris had used the money for drugs, Deputy Bowling testified she suspected that to be the case. According to Deputy Bowling, the use of drugs by Harris would have been a violation of his confidential informant agreement; however, she did not terminate the agreement, notwithstanding her suspicions. When the court inquired of Deputy Bowling what she expected Harris to do when Wilson required his services, as he had done for the past year, she responded that she hoped he would talk his way out of it and buy some time so she could control the situation. Despite her knowledge of Wilson's violence towards Harris and Freeman in the past, Deputy Bowling said she did not consider there might be a time when Harris would not be able to talk his way out of helping Wilson or notify her ahead of time before being asked to assist in a deal without arousing Wilson's suspicions. With regard to the phone call from Freeman to Deputy Bowling on the 25th, Bowling says Freeman did not mention the drug deal, while Freeman testified she did advise Bowling of the deal with "DD." It is undisputed, however, that Deputy Bowling paid Freeman for intelligence information she gave on the 25th and that law enforcement did not terminate Harris' or Freeman's confidential informant agreement's based on the drug transaction on the 25th. Notwithstanding, these concerns relate solely to Count V. The court expressed no concern at the hearing, and in fact has no concern, about anything occurring prior to Harris actually beginning his work as a confidential informant, including the circumstances surrounding his voluntary statements to law enforcement on April 1.

---

basis for the charge in Count V.  Harris' "defense" to the conspiracy charge is that he was promised immunity by law enforcement for the statements he made implicating himself in a conspiracy with Wilson in exchange for his work as a confidential informant.  His "defense" to the possession with intent to distribute charge in Count V is that this drug transaction was committed under the auspices of law enforcement while he was working as a confidential informant.  Harris' argument that his counsel failed to investigate the facts and possible defenses center on the phone calls made by Freeman to Deputy Bowling regarding Harris' involvement in the April 25th drug transaction with Brown, which relate solely to Count V.[16]

To the extent Harris argues that his lawyer's failure to investigate the matter of the phone calls led Harris to enter guilty pleas on both counts the court again disagrees. Harris' attorney was told that Deputy Bowling had not been contacted by Harris or Freeman about the drug transaction on the 25th; this is consistent with Deputy Bowling's testimony. Although she concedes she received a call from Freeman on the 25th, she disputes that Freeman told her about the drug deal with Devlon Brown during that call.  What Harris' attorney was not told (presumably because the government did not know) was that Freeman says she did make the call to Bowling which Bowling later returned, at which point Freeman told her about the drug deal.  Again, this was not information exclusively in the government's possession; in fact, Harris and his attorney had greater access to Freeman than did the government.  Notwithstanding, this is a non-issue at this point because the court finds this information relates solely to Count V.

Harris seeks to withdraw his guilty plea on Count I on the ground he was promised immunity from law enforcement for the inculpatory statements he made on April 1 and April 21 and also that he was advised by law enforcement that if he entered a guilty plea he

---

[16]  At the hearing, the court characterized the phone call from Freeman to Bowling on the 25th as "arguably exculpatory."  To clarify, this was not an indication the court felt the government had improperly withheld the information, only that the information *may have been helpful* to Harris.  Indeed, the government did advise Harris' counsel of the information it had concerning this phone call in its Rule 16 discovery letter. More important, however, is the fact that Freeman, who was certainly available to the defendant to discuss the phone calls, testified she never told Harris' counsel about the calls to Bowling on the 25th.  Again, the phone calls are relevant only to Count V.

would most likely receive a sentence of probation; otherwise, he would receive a life sentence. Harris' claims he was promised immunity by law enforcement for his statements and told by law enforcement he would receive a sentence of probation if he pled guilty are simply not credible. First, the court notes that by his own admission Harris was a serious crack addict in April 2008; thus, the court attributes very little weight to his memory of the events of that time period. Also, other evidence suggests the contrary. On the issue of immunity, Harris' attorney testified he asked Harris numerous times if anyone had made any promises to him in connection with his statements to law enforcement or his work as a confidential informant and Harris repeatedly denied any such promises had been made to him. The government submitted correspondence to Harris from his attorney documenting these conversations. Further, both Deputy Bowling and Deputy Cosby denied making any such promises to Harris or giving him similar assurances. The confidential informant agreement Harris signed contained no such language. The court notes that Harris never brought this to the court's attention prior to his plea or during the plea hearing.

On the issue of the sentence, the court again notes that the law enforcement officers in this case deny having told Harris he would receive a probationary sentence if he entered a guilty plea and otherwise would receive a life sentence. The officers testified they told Harris he could get a sentence of anywhere from probation to life, that the ultimate sentence was for the judge to decide, and that it would be in his bests interests to cooperate with the government. Even if law enforcement had made a statement to Harris that he would only get probation if he pled guilty, a finding the court does not make, any such notion or belief on Harris' part should have been dispelled at the plea hearing.

The transcript of Harris' plea hearing plainly shows a thorough and careful Rule 11 colloquy at which the undersigned went to considerable lengths to ensure that Harris' plea on both counts was knowing, intelligent and voluntary and that there was a sufficient factual basis for the plea on both counts.[17] Nothing during the hearing suggests Harris was misled

---

[17] Although the transcript obviously speaks for itself, the court notes the government has set forth in its response to defendant's motion to withdraw the specific portions of the colloquy most relevant here.

Case No.: 3:08cr47/MCR

or threatened into making the decision to plead guilty.[18]  At one point he told the court his fiancé advised him he was facing life he didn't sign the plea paperwork.  In response, the court explained to Harris in clear and unmistakable terms that he was not facing a mandatory life sentence but rather a minimum mandatory of ten years up to a maximum of life on Count I.  Harris told the court he understood the sentence he faced before he entered his plea; he also advised the court he was guilty and wanted to plead guilty.  The court notes the strong presumption that a defendant's statements during a plea colloquy are true and the heavy burden a defendant faces to show otherwise.  *See Perez*, 218 Fed.Appx. 927, 931 (11th Cir. 2007) (citing, *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) and *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988).  It was clear to the court at the plea hearing, and still is today, that Harris made the decision to enter his plea of guilty with a full understanding and appreciation for the consequences of it.[19]

It appears to the court that Harris' change of heart is the result of his counsel not being present at the post-plea debriefing between government agents and Harris.  Counsel told Harris in a letter he would be present for the debriefing but then later, after communicating with the agent, decided, unbeknownst to Harris, the debriefing could take place in his absence.[20]  When the agents arrived to meet with Harris without his attorney Harris felt betrayed and became extremely upset and belligerent and refused to meet with the agents.  Shortly thereafter, he submitted a letter to the court, which the court forwarded

---

[18]  Harris' attorney  denied pressuring Harris into his guilty plea and the transcript of the hearing reflects no such pressure by counsel.  Further, the undersigned had the opportunity to observe Harris and his attorney in the courtroom during the plea hearing and observed nothing suggesting Harris felt pressured by his attorney.

[19]  This finding takes into account the fact that Harris has only an eighth grade education.  The court has had numerous opportunities to observe Harris in the courtroom in direct communication with the undersigned and with his counsel and the government's counsel, as well as during his witness testimony.  The court has also has received written correspondence from Harris.

[20]  Because of the upcoming sentencing, Harris' attorney felt it important that the meeting between the agents and Harris be conducted as soon as possible; however, counsel was unable to be present on the date scheduled.

to defense counsel and the government, complaining he had been "railroaded" by law enforcement, the officers had improperly used him as a confidential informant and that his attorney was working with the government against his interests.[21]  This letter effectively ended any opportunity Harris had to cooperate with the government in this case.  The motion to withdraw guilty plea followed.

Although the court is mindful of its need to liberally construe the standard for withdrawal of a guilty plea on Harris' motion, in considering the totality of the circumstances, the court concludes Harris has not shown a fair and just reason to allow him to withdraw his guilty plea on Count I.[22]  Accordingly, his motion is DENIED.  The government's motion to dismiss Count V is GRANTED and Count V is DISMISSED with prejudice.

DONE and ORDERED this 24th day of July, 2009.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[21]  At the plea hearing Harris told the court he was satisfied with his attorney's representation of him, adding further support to the idea that Harris change of heart was brought about by the fact counsel did not show for the post-plea debriefing.

[22]  The court specifically finds that Harris had close assistance of counsel at the plea, his plea was knowing and voluntary, and judicial resources would be wasted by allowing the withdrawal.  *Freixas*, 332 F.2d at 1318; *United States v. Najjar,* 283 F.2d 1306, 1309 (11th Cir. 2002); *Weaver*, 275 F.3d at 1328; *Buckles*, 843 F.2d at 472.  Although given its findings the court need not consider whether the government would be prejudiced by the withdrawal, *see Buckles*, 843 F.2d at 472 n.3, the court notes a year has passed since Harris entered his guilty plea.

Case No.: 3:08cr47/MCR